1  **STEVEN AMES BROWN**
   Entertainment Law 83363
2  69 Grand View Avenue
   San Francisco, California 94114-2741
3  415/647-7700 Tele
   415/285-3048 Fax
4  sabrown@entertainmentlaw.com

5  Attorney for Plaintiff

6

7

8                UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11 DION DiMUCCI,

12                                            COMPLAINT;
            Plaintiff,                        DEMAND FOR JURY
13
       vs.
14
   ZENIMAX MEDIA, INC.,
15
            Defendant.                /
16 _____/

17

18

19

20

21

22

23

24

25

26

1. This action arises under the Labor Management Relations Act, 1947, 29 U.S.C. § 185(a). Jurisdiction is conferred by 28 U.S.C. §§ 1331, 1332(a)(1). Plaintiff Dion DiMucci is a citizen of Florida. Defendant ZeniMax Media, Inc. is a Delaware corporation with a principal place of business in Maryland. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3).

2. Defendant is subject to general jurisdiction in California because in 1999 it registered with the Secretary of State to do business herein and has maintained its registration every year since. Defendant is subject to specific jurisdiction on the basis that the contract at-issue was made under the laws of California "applicable to contracts entered into and performed entirely within the State of California".

3. Intradistrict Assignment. This action is properly filed in this division because a substantial part of the events or omissions which give rise to the claim occurred in San Francisco and the intangible property rights at-issue are managed in San Francisco County.

4. Plaintiff is singer and songwriter who has performed under the name Dion and sometimes as part of the group Dion & The Belmonts. Twenty-one of Dion's recordings have appeared on the *Billboard Top 40* charts, including *Lonely Tenager, Rounaround Sue, Ruby Baby, A Teenager in Love, Donna the Prima Donna, Drip Drop* and *"Abraham, Martin and John"*. This action involves his recording of *The Wanderer*, an iconic song of teenage angst which reached number 2 on the *Top 40* chart.

5. Dion authored the sound recording *The Wanderer* for Laurie Records in 1961. In 1961 Laurie Records was a signatory to the American Federation of Television & Radio Artists ("AFTRA") *National Code of Fair Practice for Phonograph Recordings* ("*Phono Code*"). By virtue of Laurie Records' affiliation with the guild, AFTRA had jurisdiction over the production of Dion's *The Wanderer* as his collective bargaining representative.

6. At all times hereinbelow mentioned Universal Music Enterprises, a division of UMG Recordings, Inc. ("UMG") has been the successor to Laurie Records and the owner of the common law copyright in Dion's recording of *The Wanderer,* Civil Code § 980(a)(2). At all times herein mentioned UMG has been a signatory to the successor of the *Phono Code,* the SAG-AFTRA *National Code of Fair Practice for Sound Recordings.*

7. In or about 2015 Defendant entered into a written agreement with UMG licensing *The Wanderer* for use in connection with the advertising of the videogame *Fallout 4* ("*UMG License*").

8. The *UMG License* contains a paragraph expressly for Plaintiff's benefit:

> "[Defendant] hereby represents, warrants and agrees that [Plaintiff] whose performances are embodied on [*The Wanderer*] [ ] will receive not less than the compensation and other economic benefits having a substantially equivalent economic cost to the [Defendant] as those which would be payable to [Plaintiff] if the [Defendant] were a signatory to the collective bargaining agreement applicable in the relevant medium for such use. [ ] [Defendant] hereby agrees, that in consideration for the use of the Recording, and for the express benefit of the American Federation of Television and Radio Artists, AFL-CIO ("AFTRA") and [Plaintiff], to make the above payments …"

9. The collective bargaining agreement applicable in the medium of television and Internet commercials in 2015 was the SAG-AFTRA *Commercials Contract*. The primary "economic benefits" owing to Plaintiff are contained in *Commercials Contract*, Section 28. Section 28 affords recording artists the right to separately bargain with the advertiser and prohibit the use of a recording in commercials

unless his or her terms are first met.

> "[Defendant] agrees that [ ] no part of any phonograph record, tape or other audio recording or of any other production of [Plaintiff] made under the jurisdiction of AFTRA [ ] shall be used in commercials without separately bargaining with [Plaintiff] and reaching an agreement regarding such use prior to any utilization of such [ ] sound track under this Contract. [ ]
>
> "If [Defendant] fails to separately negotiate as provided above, [Plaintiff] shall be entitled to damages for such unauthorized use equivalent to three times the amount originally paid the principal performer for the number of days of work covered by the material used plus the applicable minimum use fees under this Contract but not less than three times the applicable session fee at the rates provided under this Contract plus the applicable minimum use fees under this Contract. ***However, [Plaintiff] may, in lieu of accepting such damages, elect to bring an individual legal action in a court of appropriate jurisdiction to enjoin such use and recover such damages as the court may fix in such action***."  (emphasis added.)

10.  The rights of "consent" and "separate bargaining" as required by the *Commercials Contract's* Section 28 are the most vital of the economic benefits guaranteed to recording artists by the agreement. Section 28 affords the artist the right to control the use of his performance to the same extent as a copyright or trademark owner licensing his intellectual property. The artist can, through his bargaining and

consent rights, price and control when and how his performance is exploited in advertisements presented to the public.

11. The goodwill attached to a recording artist's performance is his asset, not that of the record company or anyone else. The artist has a vital interest in (a) controlling how, and even if, his persona (and hence his goodwill) is associated with any particular product or service and (b) profiting from the commercial exploitation of his persona. Those "economic benefits", which the *Commercials Contract* protects, Defendant promised to afford Plaintiff under the *UMG License*.

12. Pursuant to the *UMG License*, Defendant produced and commencing on or about October 18, 2015 exhibited on television and the Internet, commercial advertisements for *Fallout 4* embodying Plaintiff's *The Wanderer* ("*Commercials*").

13. However, Defendant failed to separately bargain with Plaintiff and reach an agreement concerning such use with him and obtain his advance consent before the commercials were publicly exploited as required by *Commercials Contract*, Section 28.

14. As a direct and proximate of Defendant's actions, Plaintiff has been damaged. In addition to the loss of the fee which Plaintiff had the right to charge for the use of his performance in commercial advertisements, he lost his right to refuse consent. Defendant's *Commercials* were objectionable because they featured repeated homicides in a dark, dystopian landscape, where violence is glorified as sport. The killings and physical violence were not to protect innocent life, but instead were repugnant and morally indefensible images designed to appeal to young consumers.

15. In *The Wanderer*, Dion gives life to the story of a sad young man who wanders from town to town, not having found himself or the capacity for an enduring relationship. The song describes isolation during coming of age. Without Plaintiff's consent, Defendants dubbed *The Wanderer* into commercials in which the protagonist, a wanderer, roams from one location to the next, armed and hunting for victims to

1  slaughter.  Defendant's *Commercials* have no redeeming value, they simply entice young people to buy a videogame by glorifying homicide, making the infliction of harm appear appealing, if not also satisfying.

16. Had Defendant performed its obligations and bargained with Plaintiff prior to the first use, Plaintiff could have used his right to refuse consent to persuade Defendant to change the scripts so that, for instance, they instead told the story of a post-apocalyptic struggle for survival without craven violence.  Alternately, he could have priced into his fee adequate compensation to safeguard himself against the potential loss of goodwill from being associated with the immoral images in Defendant's scripts.

17. Defendant's *Commercials* are still available online.  Their continued presence is an ongoing irreparable injury to plaintiff.  As Defendant is the owner of the copyright in its commercials, it is the party with standing to issue Digital Millennium Copyright Act "take down" notices pursuant to 17 U.S.C. § 512.  In addition to money damages for Defendant's continuing breach of the *Commercials Contract* Plaintiff seeks an injunction requiring Defendant to serve take down notices on Youtube and other online services hosting copies of Defendant's *Commercials*, which are identifiable by manual keyword searches on public search engines or through reasonable online digital scanning, all at Defendant's effort and expense.

WHEREFORE, Plaintiffs pray judgment against Defendants, jointly and severally, as follows:

1. General damages according to proof, in excess of $1,000,000.00;
2. Preliminary and permanent injunctive relief;
3. Costs of suit;
4. Such further relief as the Court may deem just;

///

///

5. Plaintiffs demand a trial by jury.

Dated: July 2, 2017

Respectfully submitted,

/S/

STEVEN AMES BROWN
Attorney for Plaintiff