UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DION DIMUCCI,<br><br>    Plaintiff,<br><br>    v.<br><br>ZENIMAX MEDIA INC.,<br><br>    Defendant. | Case No. 17-cv-03789-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 38 |

Plaintiff Dion DiMucci, a singer and songwriter, is the author of the sound recording *The Wanderer* (1961). He has filed suit against Defendant ZeniMax Media, Inc. ("ZMI"), a video game publisher, for its use of *The Wanderer* in connection with the advertising of the video game *Fallout 4*. Currently pending before the Court is ZMI's motion to compel arbitration.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** ZMI's motion.

### I.     FACTUAL & PROCEDURAL BACKGROUND

Previously, ZMI moved to dismiss Mr. DiMucci's claims, but the predicate for most of its arguments was that Mr. DiMucci was suing for breach of a collective bargaining agreement. The Court disagreed with that predicate, indicating that, although the complaint arguably lacked clarity, it appeared that Mr. DiMucci was suing for breach of a license agreement between ZMI and a third party – UMG Recordings, Inc. – and that license agreement (for which he was a third-party beneficiary) simply happened to incorporate by reference certain provisions of a collective bargaining agreement. The Court noted, however, that the license agreement between ZMI and UMG did contain an arbitration provision; thus, it appears the dispute between Mr. DiMucci and ZMI is subject to arbitration. The Court therefore instructed ZMI to file a motion to compel

arbitration, which it has now done.

For purposes of the pending motion, the relevant terms of the ZMI/UMG license agreement are as follows:

> Licensee [ZMI] hereby represents, warrants, and agrees that all Artists, whose performances are embodied on the Recording . . . will receive not less than the compensation and other economic benefits having a substantially equivalent economic cost to the Licensee [ZMI] as those which would be payable to such Artists if the Licensee [ZMI] were a signatory to the collective bargaining agreement in the relevant medium for such use. . . . Licensee [ZMI] hereby agrees that, in consideration for the use of the Recording, and for the express benefit of the American Federation of Television and Radio Artists, AFL-CIO ("AFTRA") and its members affected thereby, to make the above payments (including social security, withholding, unemployment insurance and disability insurance payments, and all appropriate contributions to the AFTRA Health and Retirement Fund), and to be bound by and comply with the arbitration provisions (and the procedures contained therein) found in the National Code of Fair Practice for Sound Recordings.

Lesher Decl., Ex. A (Lic. Agmt. ¶ 3(a)).

Based on the above, ZMI argues that the controlling arbitration provision is that found in the National Code of Fair Practice for Sound Recordings ("Sound Recordings Code"). Mr. DiMucci disagrees. According to Mr. DiMucci, the arbitration provision that applies is that found in the "collective bargaining agreement in the relevant medium for such use." Lesher Decl., Ex. A (Lic. Agmt. ¶ 3(a)). Mr. DiMucci also argues that, even if that were not the case, on its face, the arbitration provision in the Sound Recordings Code is not applicable to the instant dispute.

## II. DISCUSSION

As an initial matter, the Court takes note of ZMI's position that the governing law for this motion is that found in the Federal Arbitration Act ("FAA"). Mr. DiMucci does not dispute such, and therefore the Court proceeds with application of the FAA to the pending motion.

Under the FAA, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

## A. The Sound Recordings Code Arbitration Provision Applies

In the instant case, there is no real dispute that ZMI and UMG agreed to an arbitration provision. There is also no real dispute that Mr. DiMucci is subject to the arbitration agreement because, even though he was not a signatory to the license agreement, he is claiming rights as a third-party beneficiary of the license agreement. *See Nguyen v. Tran*, 157 Cal. App. 4th 1032, 1036 (2007) (stating that, "subject to limited exceptions, only parties to an arbitration contract may enforce it or be required to arbitrate[;] [e]xceptions in which an arbitration agreement may be enforced by or against nonsignatories include where a nonsignatory is a third party beneficiary of the agreement"); *cf. Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (noting that, in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), the Supreme Court "held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement" and "therefore look[ing] to California contract law to determine whether Toyota, as a nonsignatory, can compel arbitration").

The dispute between the parties is what *is* the governing arbitration provision.

Here, ZMI is correct that the governing arbitration provision is that found in the Sound Recordings Code. The license agreement between ZMI and UMG expressly states that the parties agree "to be bound by and comply with the arbitration provisions (and the procedures contained therein) found in the National Code of Fair Practice for Sound Recordings [*i.e.*, the Sound Recordings Code]."[1] Lesher Decl., Ex. A (Lic. Agmt. ¶ 3(a)).

Mr. DiMucci's argument to the contrary is not persuasive. Mr. DiMucci points to the following term in the ZMI/UMG license agreement.

> Licensee [ZMI] hereby represents, warrants, and agrees that all Artists, whose performances are embodied on the Recording . . . will receive not less than the compensation and other economic benefits having a substantially equivalent economic cost to the Licensee [ZMI] as those which would be payable to such Artists if the

---

[1] Technically, the license agreement states that ZMI agrees to be so bound. It does not reference UMG. However, neither ZMI nor Mr. DiMucci argues that the arbitration provision in the license agreement is unilateral – *i.e.*, applicable only to ZMI and not UMG. Any argument that the arbitration provision is solely unilateral and cannot be invoked by UMG or its beneficiary has been waived.

3

> Licensee [ZMI] were a signatory to the collective bargaining agreement in the relevant medium for such use.

Lesher Decl., Ex. A (Lic. Agmt. ¶ 3(a)). According to Mr. DiMucci, this makes the arbitration provision in the relevant collective bargaining agreement applicable – *i.e.*, the arbitration provision is one of the economic benefits provided for in the relevant collective bargaining agreement. Mr. DiMucci then argues that that the relevant collective bargaining agreement happens to be the SAG-AFTRA Commercials Contract, and the § 28 of the Commercials Contract specifies that an artist has the option of bringing a lawsuit to obtain relief. *See* Compl. ¶ 9 (alleging that, under § 28, no recording of an artist shall be used on a commercial without separately bargaining with the artist and reaching an agreement regarding use; if there is no separate bargaining, then the artist is entitled to certain damages or, in lieu of such damages, the artist may elect to bring a lawsuit to enjoin the use and recover damages).

For purposes of this opinion, the Court assumes that the Commercials Contract is the relevant collective bargaining agreement. The problem with Mr. DiMucci's argument is that the only part of the collective bargaining agreement that is relevant under the ZMI/UMG license agreement is that by which "compensation and other economic benefits having a substantially equivalent economic cost to the Licensee [ZMI]" is to be measured. Lesher Decl., Ex. A (Lic. Agmt. ¶ 3(a)). Mr. DiMucci contends that an artist's right to file an action in a court (a public forum) is an economic benefit and, as such, that right under the collective bargaining agreement applies. *See, e.g.*, Opp'n at 10. However, the right to bring an action in a court (instead of filing an arbitration) is not a clear economic benefit like "disability insurance payments" or "contributing" to the AFTPA Health and Retirement Fund referenced in the same clause. Indeed, the meaning of the full phrase "economic benefits" must be viewed in context of the sentence that follows the term: "Licensee [ZMI] hereby agrees that, in consideration for the use of the Recording, and for the express benefit of the American Federation of Television and Radio Artists, AFL-CIO ("AFTRA") and its members affected thereby, *to make the above payments* (including social security, withholding, unemployment insurance and disability insurance payments, and all appropriate contributions to the AFTRA Health and Retirement Fund)." Lesher Decl., Ex. A (Lic. Agmt. ¶ 3(a)) (emphasis added). Thus, "economic benefits having a substantially equivalent

4

economic cost to the Licensee [ZMI]" implicitly means things such as social security, withholding, unemployment insurance, and so forth. In contrast, the benefit asserted here by Mr. DiMucci – the right to pick a forum – is a benefit entirely unlike those listed in the paragraph.

Moreover, Mr. DiMucci reads out the full phrase used in the license agreement – it is not just "economic benefits" that are mentioned but rather "economic benefits *having a substantially equivalent economic cost to the License*e [ZMI]." Lesher Decl., Ex. A (emphasis). Given the full phrase, the right to bring a lawsuit in court is not something encompassed by the term "economic benefits."

Finally, Mr. DiMucci's construction of the license agreement ignores its plain language which specifically incorporates the arbitration provision of the Sound Recordings Code. That incorporation is not qualified.

B. <u>Text of the Arbitration Provision in the Sound Recordings Code Tracks the License Agreement</u>

ZMI has provided a copy of the Sound Recordings Code as Exhibit B to the Lowe declaration. *See* Lowe Decl. ¶ 3 (testifying that the copy was found on the SAG-AFTRA website and that, although the Code is dated 2002-2006, and was thereafter modified, no modifications were made to the arbitration provision). Mr. DiMucci does not argue that the copy is not the right Code.

The Sound Recordings Code provides that it is between AFTRA and "the undersigned Producer of sound recordings (hereinafter called the 'Company')." Lowe Decl., Ex. B (Sound Recordings Code at 1). The Company would be music companies such as UMG, Atlantic Recording Corporation, SonyBMG Music Entertainment, etc. *See, e.g.*, 2007-2010 Sound Recordings Code, Memorandum of Agreement, *available at* http://www.sagaftra.org/prod-center/contract/354/agreement/document%2C?page=1 (last visited December 22, 2017).

The Code then provides that it "contains the minimum terms and conditions for the engagement of actors and singers (hereinafter called 'Artists') for the purpose of making sound recordings in the United States." Lowe Decl., Ex. B (Sound Recordings Code at 1).

Although the Code initially states that "[t]he Company agrees not to make recordings

produced under this Agreement . . . available for use of any kind or nature whatsoever in any other medium," it goes on to state that

> the Company may make available a recording, or portion thereof, for use in any other medium provided that the Company obtains from the Producer in such medium the following warranty and representation for the benefit of the Artists performing thereon:
>
> > "That all Artists, whose performances embodied thereon were recorded in the recording territory, will receive not less than the compensation and other economic benefits having a substantially equivalent economic cost to the Producer as those which would be payable to such Artists if the Producer were a signatory to the collective bargaining Agreement applicable in the relevant medium for such use.
> >
> > Producer hereby agrees, that in consideration for the use of a recording referenced above, and for the express benefit of AFTRA and its members affected thereby, to make the above payments (including all social security, withhold, unemployment insurance and disability insurance payments, and all appropriate contributions to the AFTRA Health and Retirement Funds), and to be bound by and comply with the arbitration provisions (and the procedures contained therein) found in the National Code of Fair Practice for Sound Recordings."

Lowe Decl., Ex. B (Sound Recordings Code at 1). Notably, this language was ultimately used in the license agreement between ZMI and UMG so that UMG could use *The Wanderer* in a different medium (*i.e.*, as part of an advertisement for a video game). Hence, the ZMI/UMG license agreement dovetails with the Sound Recording Code, and its incorporation by reference is entirely coherent.

The arbitration provision for the Sound Recordings Code is found in § 3. It provides in relevant part as follows:

> All disputes and controversies of any kind and nature whatsoever between any Company and AFTRA or between any Company and any member of AFTRA, arising out of or in connection with this Code, and any contract or engagement made or extended on or after April 1, 1983 (whether overscale or not, and whether at the minimum terms and conditions of this Code or better) in the field covered by this Code as to the existence, validity, construction, meaning, interpretation, performance, non-performance, enforcement, operation, breach, continuance, or termination of this Code and/or such contract or engagement shall be submitted to arbitration in accordance with the following procedure. Such

6

1
2

> arbitration shall be conducted under the Voluntary Labor Rules then obtaining of the American Arbitration Association except as otherwise provided herein . . . .

3 Lowe Decl., Ex. B (Sound Recordings Code § 3).

4 C. <u>The Arbitrator Decides Arbitrability</u>

According to Mr. DiMucci, even if arbitration provision of the Sound Recordings Code applies, it does not cover the present dispute for two reasons:

(1) The Sound Recordings Code applies only to the making of sound recordings in the United States, *see* Lowe Decl., Ex. B (Sound Recordings Code at 1) (stating that the Code "contains the minimum terms and conditions for the engagement of actors and singers (hereinafter called 'Artists') for the purpose of making sound recordings in the United States"), and ZMI is not a producer of sound recordings and did not hire Mr. DiMucci for the purpose of making sound recordings. *See* Opp'n at 5.

(2) The Sound Recordings Code arbitration provision applies only to disputes arising out of breach of the Code. *See* Opp'n at 5.

The problem for Mr. DiMucci is – as ZMI argues – the issue of arbitrability should be decided by the arbitrator, and not this Court. Under Supreme Court precedent, "the question 'who has the primary power to decide arbitrability' turns upon whether the parties agreed about *that* matter. Did the parties agree to submit the arbitrability question itself to the arbitration?" *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (emphasis in original). In addition, under Supreme Court precedent, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944.

In the instant case, that the issue of arbitrability should be decided by the arbitrator is established by the Sound Recording Code's incorporation by reference of the Voluntary Labor Rules of the AAA. Voluntary Labor Rule 3(a) provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." Lowe Decl., Ex. C (AAA Labor Arbitration Rules) (Rule 3(a)).

Admittedly, "the question of whether the incorporation of the AAA Rules is *always* 'clear

7

and unmistakable' evidence of the parties' intent to arbitrate arbitrability is not a clearly settled question of law in the Ninth Circuit." *Zenelaj v. Handbook, Inc.*, 82 F. Supp. 968, 972 (N.D. Cal. 2015) (Henderson, J.) (emphasis in original). But, as Judge Henderson noted in *Zenelaj*, in *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069 (9th Cir. 2013), the Ninth Circuit held that, "as along as an arbitration agreement is between sophisticated parties to commercial contracts, those parties shall be expected to understand that incorporation of [a certain body's] rules delegates questions of arbitrability to the arbitrator." *Id.* at 1075. Here, the license agreement was a commercial contract entered into by two sophisticated parties (ZMI and UMG), and incorporated by reference the Sound Recordings Code which is also a commercial contract entered into by two sophisticated parties (AFTRA and a music company). Even if Mr. DiMucci himself were not a sophisticated party, he is claiming relief as a third-party beneficiary of UMG which is. In any event, it is not clear that party sophistication is a requirement in the first place. *See Zenelaj*, 82 F. Supp. at 974 (stating that, while *Oracle* has a narrow holding, the Ninth Circuit in *Oracle* still "favorably acknowledged the 'prevailing view' expressed in the cited cases, all of which found clear and unmistakable delegation of arbitrability regardless of the parties' sophistication"; adding that "nearly every subsequent decision in the Northern District of California . . . has consistently found effective delegation of arbitrability regardless of the sophistication of the parties").

"In cases where the parties 'clearly and unmistakably intended to delegate the power to decide arbitrability to an arbitrator,' the district court's inquiry is 'limited . . . [to] whether the assertion of arbitrability is "wholly groundless."'" *Id.* at 975. Here, the assertion of arbitrability is not wholly groundless, as discussed below.

D. <u>Assertion of Arbitrability is Not Wholly Groundless</u>

As noted above, Mr. DiMucci contends that the Sound Recordings Code's arbitration provision is not applicable to the dispute in the instant case for two reasons:

(1) The Sound Recordings Code applies only to the making of sound recordings in the United States, *see* Lowe Decl., Ex. B (Sound Recordings Code at 1) (stating that the Code "contains the minimum terms and conditions for the engagement of actors and singers (hereinafter called 'Artists') for the purpose of making sound recordings in the

8

United States"), and ZMI is not a producer of sound recordings and did not hire Mr. DiMucci for the purpose of making sound recordings. *See* Opp'n at 5.

(2) The Sound Recordings Code arbitration provision applies only to disputes arising out of breach of the Code. *See* Opp'n at 5.

Neither argument is particularly persuasive. With respect to the first argument, Mr. DiMucci discounts the discussion in the Sound Recordings Code that says that a

> Company may make available a recording, or portion thereof, for use in any other medium provided that the Company obtains from the Producer in such medium the following warranty and representation for the benefit of the Artists performing thereon:
>
> "That all Artists, whose performances embodied thereon were recorded in the recording territory, will receive not less than the compensation and other economic benefits having a substantially equivalent economic cost to the Producer as those which would be payable to such Artists if the Producer were a signatory to the collective bargaining Agreement applicable in the relevant medium for such use.
>
> Producer hereby agrees, that in consideration for the use of a recording referenced above, and for the express benefit of AFTRA and its members affected thereby, to make the above payments (including all social security, withhold, unemployment insurance and disability insurance payments, and all appropriate contributions to the AFTRA Health and Retirement Funds), and to be bound by and comply with the arbitration provisions (and the procedures contained therein) found in the National Code of Fair Practice for Sound Recordings."

Lowe Decl., Ex. B (Sound Recordings Code at 1). As noted above, this language was ultimately used in the license agreement between ZMI and UMG so that UMG could use *The Wanderer* in a different medium (*i.e.*, as part of an advertisement for a video game). Thus, contrary to what Mr. DiMucci argues, the Sound Recordings Code specifically contemplates that a Company will give a license to another to use the sound recording; the Code is not restricted to the making of sound recordings.[2]

---

[2] Even if the Code did not on its own apply to licenses for other uses, the license agreement does apply here and nothing prevents the parties from voluntarily incorporating provisions in the Code by reference.

9

As for the second argument, it fares no better. As an initial matter, the Court should note that, in its reply brief, ZMI argues that, under the ZMI/UMG license agreement, the companies "agreed to arbitrate all disputes, and not just those under the Sound Recordings Code."[3] Reply at 8; *see also* Lesher Decl., Ex. A (Lic. Agmt. ¶ 3(a)) (agreeing "to be bound by and comply with the arbitration provisions (and the procedures contained therein) found in the National Code of Fair Practice for Sound Recordings"). The Court, however, need not address that argument (although it notes that the argument is compelling) because, even if arbitrable disputes under the license agreement were limited to arbitrable disputes under the Code, Mr. DiMucci's position is not persuasive.

The arbitration provision in the Sound Recordings Code states as follows:

> All disputes and controversies of any kind and nature whatsoever between any Company and AFTRA or between any Company and any member of AFTRA, arising out of or in connection with this Code, and any contract or engagement made or extended on or after April 1, 1983 (whether overscale or not, and whether at the minimum terms and conditions of this Code or better) in the field covered by this Code as to the existence, validity, construction, meaning, interpretation, performance, non-performance, enforcement, operation, breach, continuance, or termination of this Code and/or such contract or engagement shall be submitted to arbitration in accordance with the following procedure. Such

---

[3] According to ZMI,

> straightforward contractual rules of interpretation reject Plaintiff's interpretation that [ZMI] is bound to arbitrate only those disputes that would normally fall under the Sound Recordings Code. Plaintiff's interpretation is implausible. Plaintiff asserts that the Sound Recordings Code applies only to the "making of sound recordings," *i.e.*, the making of *new* sound recordings. Plaintiff further asserts that his "sole claim is that his existing 1961 sound recording was used in 2015 TV and Internet commercials and that Defendant failed to provide him the economic benefits specified . . . as required." The subject matter of the License Agreement concerns the *existing* 1961 sound recording of *The Wanderer* only. It does not concern any *new* recordings by Plaintiff or any other artists. Accepting Plaintiff's view, the License Agreement's arbitration provisions would apply only where a new recording had been made, but the License Agreement on its face concerns an *existing* recording. Therefore, the arbitration provisions referenced in the License Agreement would be meaningless under Plaintiff's interpretation, which the law rejects.

Reply at 11.

> arbitration shall be conducted under the Voluntary Labor Rules then obtaining of the American Arbitration Association except as otherwise provided herein . . . .

Lowe Decl., Ex. B (Sound Recordings Code § 3). The provision thus covers disputes/controversies between a Company[4] and AFTRA, or between the Company and an AFTRA member, "arising out of or in connection with this Code, *and* any contract . . . in the field covered by this Code as to the existence, validity, . . . meaning, interpretation, [etc.] of this Code and/or such contract." Lowe Decl., Ex. B (Sound Recordings § 3) (emphasis added). Thus, a dispute between a Company (or the Company stand-in such as ZMI) and an AFTRA member that arises in connection with (1) the Sound Recordings Code and (2) a contract in the field (as to, *e.g.*, interpretation of the contract) is arbitrable.

The dispute between ZMI and Mr. DiMucci arises in connection with the Sound Recordings Code – as noted above the Code addresses the use of a sound recording in different media. The dispute also arises in connection with a "contract in the field," because, as already noted, the Code covers not only the production of sound recordings but also the use thereof in different media, and the ZMI/UMG license agreement is a contract in that field. Notably, Mr. DiMucci ignores the "arising . . . in connection with" language and focuses on the "arising out of" language only. The addition of "in connection with" implies a broader reach than "arising out of." *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (noting that "[e]very court that has construed the phrase 'arising in connection with' in an arbitration clause has interpreted that language broadly" and "likewise conclud[ing] that the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract").)

Accordingly, contrary to what Mr. DiMucci argues, his dispute with ZMI is covered by the arbitration provision in the Sound Recordings Code, and the assertion of arbitrabilty is not wholly groundless.

---

[4] Here, ZMI would be the stand-in for the Company, as the Company could give a license to ZMI for use of the sound recording in a different medium.

11

### III. <u>CONCLUSION</u>

For the foregoing reasons, the motion to compel arbitration is **GRANTED**. The Court shall stay the proceedings in this case pending resolution of the arbitration. *See* 9 U.S.C. § 3.

This order disposes of Docket No. 38.

**IT IS SO ORDERED**.

Dated: January 9, 2018

_____
EDWARD M. CHEN
United States District Judge

United States District Court
For the Northern District of California